IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

STEWART TITLE GUARANTY
COMPANY,
    *Plaintiff*,

v.

SANFORD TITLE SERVICES, LLC,
*et al.*

    *Defendants*.

Civil Action No. ELH-11-00620

## MEMORANDUM OPINION

Stewart Title Guaranty Company ("Stewart Title"), plaintiff, filed a complaint against nineteen defendants, containing twelve counts, arising out of an alleged scheme to defraud plaintiff by theft of funds held in escrow accounts; those funds were intended to satisfy mortgages and to pay recording fees, title insurance premiums, and real property taxes for property owners and lenders insured by Stewart Title. *See* Complaint, ECF 1.[1] As a result of the thefts, Stewart Title had to expend substantial sums to cover the losses. All claims have been resolved, with the exception of those lodged against defendant Nieshia Williams. *See* Status Report, ECF 220; Order Dismissing Claims, ECF 222.

---

[1] Several counterclaims and cross claims were subsequently filed, but they are not pertinent to the motion at issue.

This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff is a Texas corporation with its principal place of business in Texas, ECF 1 ¶ 3; the defendants were citizens of either Maryland, the District of Columbia, or New Jersey, *id.* ¶¶ 4–20; and the amount in controversy exceeds $75,000. *Id.* ¶ 1.

Stewart Title has filed a motion for summary judgment against Ms. Williams ("Motion," ECF 183), supported by a memorandum ("Memo," ECF 183-1) and exhibits. Ms. Williams has not responded to the Motion.[2]

## Factual Summary

In its Memo, Stewart Title summarized its allegations against Ms. Williams as follows, Memo at 3 (citations omitted):

> The Defendant, along with her father, Leon Williams, and Defendant's corporation, Revolutionary Marketing, Inc. ("Revolutionary Marketing"), arranged for "straw buyers" to purchase real property, then split the sale proceeds between themselves, the seller and the straw buyer. Sanford Title Services, LLC ("Sanford Title") was the settlement company for many of these transactions. The Defendant, Leon Williams, and Revolutionary Marketing received escrow funds directly in numerous Sanford Title transactions. Sanford Title's auditor, Ronald Talbert, could find no legitimate reason or explanation for the Defendant's receipt of those escrow funds. Through those transactions (and other Sanford Title closings) the Defendant and her co-conspirators received hundreds of thousands of dollars in escrow funds to which they had no rightful claim. As detailed more fully herein, the conspirators received (at least) the following sums directly from Sanford Title's escrow account: Nieshia Williams - $186,677.04; Revolutionary Marketing: $202,160.02; Leon Williams - $174,677.04.

Relying on voluminous bank records, real estate settlement documents, affidavits, and deposition testimony, Stewart Title set out the contours of the scheme allegedly perpetrated by Ms. Williams and her co-conspirators. Specifically, Stewart Title provided extensive evidence establishing that $388,837.06 of escrow funds were diverted either to Ms. Williams or to her

---

[2] After the Motion was filed, Stewart Title filed a "Suggestion Of Bankruptcy" (ECF 197), in which it gave notice that Ms. Williams had "filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code." *Id.* Because of the automatic stay under 11 U.S.C. § 362(a) as to the claims against Ms. Williams, I administratively closed the Motion, without prejudice to Stewart Title's right to renew it if the stay was lifted. *See* ECF 201. On May 7, 2013, Stewart Title notified the Court that the automatic stay had been terminated and it moved to renew the Motion. *See* ECF 223. I granted that request on May 8, 2013, and directed Ms. Williams to respond within twenty-one days. *See* ECF 224. However, she failed to do so.

company, Revolutionary Marketing, and then spent by Ms. Williams on "expensive cars, international travel, and extravagant shopping sprees." *Id.* at 7; *see* Affidavit of Ronald Talbert, Sanford Title's auditor ("Talbert Aff.," ECF 183-3) ¶¶ 5; Citi Documents, Memo Ex. D (ECF 183-5); Bank Records, Memo Ex. F (ECF 183-7).

In its Memo, plaintiff described various fraudulent occurrences, including the following.

Ms. Williams approached Jillian Harper, an acquaintance of hers, and offered her $10,000 to act as a "straw buyer" in a real estate purchase. *See* Deposition of Jillian Harper ("Harper Dep.," ECF 183-4) at 14–15. Ms. Williams explained that an unidentified man with bad credit wanted to purchase property at 1307 W. Lombard Street in Baltimore, Maryland, but was unable to obtain a loan. *Id.* Ms. Williams convinced Harper to procure a loan of $272,000, claiming that the man would pay the mortgage for six months while Ms. Williams "cleared up his credit." *Id.* Once the man's credit problems were fixed, the man would purchase the property from Harper. *Id.* at 22. Harper took out the loan on her credit, and most of the funds from the loan were placed in an escrow account held by Sanford Title. *Id.* Then, Sanford Title wired $174,289.50 of those funds to Ms. Williams' company, Revolutionary Marketing, which then wired at least $45,000 into Ms. Williams' personal bank account. *See* Talbert Aff. ¶ 5(d). Ms. Williams falsified settlement documents and paid the mortgage for several months, but she never arranged for the unidentified man to purchase the property. Harper Dep. at 30–31, 39–40. Eventually, Ms. Williams "disappeared" and left Harper with the mortgage in Harper's name. *Id.* at 30.

Sanford Title conducted closings and issued title insurance policies for several of the fraudulent transactions underwritten by Stewart Title. *See, e.g.*, Memo Exs. N-2, O-3. When

Sanford Title ran out of funds to cover its obligations to policyholders, Stewart Title was forced to reimburse those policyholders, record instruments, purchase title reports, pay property taxes, pay escrow shortages, pay off existing liens, and "otherwise resolve any claims that were adverse to the interests of the insured owners and lenders."  Affidavit of Mark V. Borst, Vice President and Regional Claims Counsel for Stewart Title ("Borst Aff.," ECF 183-8) ¶ 5; *see id.* ¶¶ 2–7.

Stewart Title sought to depose Ms. Williams on August 5, 2011.  *See* Deposition of Nieshia Williams, ECF 183-2.  Ms. Williams provided her name and home address, but thereafter she invoked her Fifth Amendment right against self-incrimination and refused to answer all other questions.  *Id.*

Ms. Williams was charged criminally for her conduct.  *See United States v. Nieshia Williams*, Case JKB-12-659 (D. Maryland).[3]  On March 1, 2013, Ms. Williams signed a plea agreement, in which she agreed to plead guilty to conspiracy, arising out of the same fraudulent scheme alleged by Stewart Title, in violation of 18 U.S.C. § 1349.  *See* Plea Agreement, ECF 223-3.[4]  In the Plea Agreement, Ms. Williams admitted, *id.* at 2:

> Defendant knowingly and willfully combined, conspired, confederated, and agreed with [co-conspirators] to participate in a scheme to defraud banks, lenders, lien holders, a title insurance company,[5] and buyers and sellers of real estate and

---

[3] Ms. Williams is one of six co-defendants in the criminal case.

[4] Stewart Title submitted the Plea Agreement as an exhibit to its Request to Renew its Motion for Summary Judgment.  *See* ECF 223.  Additionally, I take judicial notice of Williams' indictment, ECF 37 in case JKB-12-659, and the tender of Williams' guilty plea, ECF 62 in case JKB-12-659.  *See, e.g.*, *Lolavar v. de Santibanes,* 430 F.3d 221, 224 n. 2 (4th Cir. 2005) (taking judicial notice of court records); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (taking judicial notice of guilty pleas).

[5] The title insurance company is identified in the indictment and elsewhere in the plea agreement as Stewart Title.  *See* ECF 37, 62 in case JKB-12-659.

obtain money or property by materially false and fraudulent pretenses, representations or promises . . . in violation of 18 U.S.C. § 1343.

Under the plea agreement, Ms. Williams also admitted that she "knew of the unlawful purpose of the agreement" and that she "joined in the agreement willfully, that is, with the intent to further its unlawful purpose." *Id.* In addition, Ms. Williams agreed to a lengthy Factual Stipulation, which recounted in detail her involvement in the Conspiracy. *See* ECF 223-3. And, as part of the Plea Agreement, Williams agreed "to the entry of a Restitution Order for the full amount of the victims' losses, which the parties stipulate is at least $1,384,758." *Id.* at 6.[6]

Ms. Williams tendered her plea of guilty on March 21, 2013. *See* ECF 60 in case JKB-12-659. She is awaiting sentencing.

## Standard of Review

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. It provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).

---

[6] Any funds that Stewart Title collects from Williams pursuant to a judgment in this case would reduce the amount that Stewart Title may recover from any restitution order arising from the Plea Agreement. *See* Plea Agreement at 6–7.

Of import here, a court may not grant summary judgment solely because the nonmoving party fails to file a response. Rather, the court must examine the facts presented, draw all inferences in favor of the nonmoving party, and then determine whether "the movant is entitled to [summary judgment]." Fed. R. Civ. P. 56(e)(3); *see also* Advisory Committee Note on 2010 Amendment to subdivision (e) of Rule 56 ("[S]ummary judgment cannot be granted by default even if there is a complete failure to respond to the motion . . . .").

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," there is a dispute of material fact that precludes summary judgment. *Anderson*, 477 U.S. at 248. In resolving a summary judgment motion, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. However, "[i]t is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24)), *cert. denied*, 541 U.S. 1042 (2004).

## Discussion

Stewart Title seeks to recover damages from Ms. Williams for unjust enrichment and conspiracy to commit fraud. Under either theory, Stewart Title argues that it is entitled to an

award of $388,837.06.[7]

To prevail on a claim for conspiracy to commit fraud, a plaintiff must prove the elements of both fraud and conspiracy. *See Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 154, 916 A.2d 257, 284 (2007). Accordingly, Stewart Title would have to prove: (1) A confederation of two or more persons by agreement or understanding to commit fraud; (2) that a false representation was made by a party; (3) that its falsity was known to that party or that the misrepresentation was made with reckless indifference to truth; (4) that the misrepresentation was made for the purpose of defrauding some other person; (5) that the person reasonably relied on the misrepresentation and would not have done the thing from which the damage resulted if the misrepresentation had not been made; and (6) that the person suffered damage directly resulting from the misrepresentation. *See id.* at 154, 916 A.2d at 284 (stating elements of civil conspiracy); *Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156, 1161 (1993) (stating elements of fraud).

Unjust enrichment consists of three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007).

---

[7] The law of the forum state, Maryland, guides this Court's choice-of-law analysis. *See CACI Int'l., Inc. v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009). It does not appear that the state of Maryland has conclusively decided the test to be applied in an unjust enrichment case. *See Sensormatic Sec. Corp. v. Sensormatic Electronics Corp.*, 249 F. Supp. 2d 703, 707 (D. Md. 2003). Under either Restatement (First) of Conflict of Laws § 453, Restatement (Second) of Conflict of Laws § 221, or the *lex loci delicti* rule that Maryland courts apply to tort cases, I conclude that Maryland courts would apply Maryland law in this case, as Williams was unjustly enriched in Maryland as a result of fraudulent transactions related to real property located almost entirely in Maryland.

In her Plea Agreement, Ms. Williams admitted to committing acts that satisfy each of the elements as to both claims. In essence, Ms. Williams admitted that she received financial benefit from insured owners and lenders by means of a criminal conspiracy, and that she did so knowingly and willfully, and with the intent to defraud. *See* Plea Agreement at 1–2, 11–19. And, Ms. Williams obtained economic benefit from her conduct, at plaintiff's expense.

Even if Ms. Williams had filed a response to the Motion, her plea of guilty would estop her from disputing the facts admitted pursuant to her guilty plea. *See Lowery v. Stovall,* 92 F.3d 219 (4th Cir. 1996) (holding that officer was estopped in civil litigation from arguing anything inconsistent with his guilty plea); *Moore v. United States*, 360 F.2d 353, 356 (4th Cir. 1965) ("[A] criminal conviction for tax evasion works a collateral estoppel on the issue of fraud in a subsequent civil suit over a fraud penalty covering the same years."); *Dorsey v. Ruth,* 222 F. Supp. 2d 753 (D. Md. 2002) ("Dorsey cannot now assert facts which are inconsistent with his guilty plea in this civil suit."); *see also Eagan v. Calhoun,* 347 Md. 72, 88, 698 A.2d 1097 (1997) (holding that when husband acknowledged in a separate proceeding that the killing of his wife was voluntary manslaughter, "the force of that estoppel allows the plea of guilty to stand unrebutted and thus to establish that the killing was a voluntary manslaughter"). Accordingly, there is no genuine dispute of material fact that Ms. Williams was unjustly enriched by her involvement in the conspiracy.

Although Stewart Title claims that it has suffered losses exceeding one million dollars as a result of the conspiracy, it proffers evidence that Ms. Williams and/or Revolutionary Marketing were unjustly enriched in the amount of $388,837.06. In particular, Stewart Title submitted bank statements, check stubs, wire transfer statements, and deposition testimony evidencing that Ms.

Williams wrongfully obtained $141,475.83 from escrow on property located at 1054 Vine Street in Baltimore; $35,201.21 from escrow on property at 1630 Rosedale Avenue, N.E., in Washington, D.C.; $7,300 from escrow on property at 1813 N. Payson Street in Baltimore, $194,860.02 from escrow on property at 1307 W. Lombard Street in Baltimore; and $10,000 from escrow on an unknown property. *See* Talbert Aff. ¶¶ 5(a)–(f); Memo Exs. B-1–B-6. This evidence, along with Ms. Williams' admissions pursuant to the Plea Agreement, leaves no genuine dispute of material fact that Ms. Williams was unjustly enriched in the amount of $388,837.06.

However, Ms. Williams never diverted or received any funds directly from Stewart Title. Rather, Ms. Williams misappropriated funds from the escrow accounts of owners and lenders insured by Stewart Title. Plaintiff suffered damages because it had to undo the damage done to the interests of the owners and lenders who were the direct victims of the conspiracy. According to Stewart Title, it expended more than one million dollars "of its own funds to pay off mortgages, pay recording fees, and compensate owners and lenders damaged by the theft of escrow funds." Motion at 1. Stewart Title maintains that it is entitled to recover from Ms. Williams because it "is subrogated to the rights its insured owners and lenders would have had against the Defendant for stealing the funds arising from their transactions." Memo at 17.

A title insurance policy like that issued by Stewart Title protects the insured against loss or damage as a result of defects in or the unmarketability of the insured's title to real property. *Stewart Title Guar. Co. v. West*, 110 Md. App. 114, 128, 676 A.2d 953, 960 (1996); 7 *Powell on Real Property* ¶ 1029 at 92-5 (1995); John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 5201 at 2 (1981). Its purpose is to safeguard a transferee of real estate from the

possibility of a loss through defects that may cloud the title. Appleman, *Insurance Law and Practice*, § 5201 at 8; *Stewart Title Guar. Co.*, 110 Md. App. at 128, 676 A.2d at 960.

Ordinarily, there are three components of title insurance. *See* D. Barlow Burke, Jr., *Real Estate Transactions: Examples and Explanations* 185 (1993). First, it is an indemnity agreement to reimburse the insured for loss or damage resulting from title problems. *Id.* Second, it is "litigation insurance," by which the insurer is required to defend the insured in the event the insured's title is attacked by a third party. *Id.* Finally, and "perhaps above all, it involves the hiring of experts in title matters." *Id.*

As an indemnity agreement, the insurer agrees to reimburse the insured for loss or damage sustained as a result of title problems, as long as coverage for the damages incurred is not excluded from the policy. *First Federal Savings and Loan Ass'n of Fargo, N.D. v. Transamerica Title Insurance Co.*, 19 F.3d 528, 530 (10th Cir. 1994); *Stewart Title Guar. Co.*, 110 Md. App. at 129, 676 A.2d at 960. When an insured notifies an insurer of a title problem, the insurer ordinarily has three choices. *See Stewart Title Guar. Co.*, 110 Md. App. at 129, 676 A.2d at 960. It may either (1) pay the insured for the loss up to the amount of the coverage limits of the policy, *see* 15A *Couch on Insurance* § 57:172; (2) clear the title defect within a reasonable time, *see* Appleman, *Insurance Law and Practice* § 5214; or (3) show that the alleged unmarketability or other title problems do not really exist, and thus there is no way in which the insured could sustain any loss. *See* 15A *Couch on Insurance* § 57:177.

As noted, Stewart Title argues that it is subrogated to the rights of its insured owners and lenders who were victims of the conspiracy. The doctrine of subrogation allows "'one person … to stand in the shoes of another and assert his rights.'" *Hill*, 402 Md. at 313, 936 A.2d at 362

(quoting Daniel B. Dobbs, *Handbook on the Law of Remedies* § 4.3 (1973)). "[I]t is generally recognized that an insurer is subrogated to the claims of its insured against others, whether *ex contractu* or *ex delicto*, once the insurer has indemnified the insured for his loss." *Travelers Indem. Co. v. Insurance Co. of North America*, 69 Md. App. 664, 680, 519 A.2d 760, 768 (1987). The insurer is subrogated to "'all the rights of recovery of the insured of every nature, whatsoever.'" *Id.*, 519 A.2d at 768 (quoting *Svea Assurance Co. v. Packham*, 92 Md. 464, 465– 66, 48 A. 359 (1901)); *see also Stancil v. Erie Ins. Co.*, 128 Md. App. 686, 693, 740 A.2d 46, 50 (1999). Accordingly, Stewart Title may assert the rights of its insureds, provided that it has indemnified its insureds for their loss or otherwise cleared any title defect caused by the conspiracy. *See Stewart Title Guar. Co.*, 110 Md. App. at 129, 676 A.2d at 961.

There is no genuine dispute of material fact as to whether Stewart Title has indemnified or otherwise made whole its insureds. The Borst Affidavit details several insurance policies on which Stewart Title received claims from owners and lenders related to the conspiracy, and it also lists the amounts expended by Stewart Title to resolve those claims. See Borst. Aff. ¶¶ 6(a)–(i). Stewart Title also submitted a summary chart of its records relating to its disbursements. See Memo Ex. N-2. In all, Stewart Title "has expended a total of **$1,630,318.78** to correct title claims related to this case, including recording costs, property taxes, lien payoffs, and settlements with insured lenders and owners." Borst Aff. ¶ 11 (emphasis in original). In light of the exhibits, including the Plea Agreement, there is no genuine dispute of material fact that Ms. Williams was unjustly enriched and that Stewart Title is subrogated to the rights of its insured owners and lenders who suffered losses as a result of the conspiracy.

## CONCLUSION

For the foregoing reasons, the Court will grant the Motion for Summary Judgment.   A separate Order, consistent with this Memorandum Opinion, follows.


Date: October 8, 2013                                    _____/s/_____
                                                         Ellen Lipton Hollander
                                                         United States District Judge